**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 13-2399**

_____

ANDREA GAIL JONES,

              Plaintiff - Appellee,

     v.

SOUTHPEAK INTERACTIVE CORPORATION OF DELAWARE; TERRY M. PHILLIPS; MELANIE J. MROZ,

              Defendants – Appellants.

--------------------------

THOMAS E. PEREZ, Secretary of the United States Department of Labor,

              Amicus Supporting Appellee.

_____

**No. 14-1765**

_____

ANDREA GAIL JONES,

              Plaintiff - Appellee,

     v.

SOUTHPEAK INTERACTIVE CORPORATION OF DELAWARE; TERRY M. PHILLIPS; MELANIE J. MROZ,

              Defendants - Appellants.

_____

Appeals from the United States District Court for the Eastern District of Virginia, at Richmond. Robert E. Payne, Senior District Judge. (3:12-cv-00443-REP-DJN)

_____

Argued: December 10, 2014          Decided: January 26, 2015

_____

Before TRAXLER, Chief Judge, and KEENAN and THACKER, Circuit Judges.

_____

Affirmed by published opinion. Judge Thacker wrote the opinion, in which Chief Judge Traxler and Judge Keenan joined.

_____

**ARGUED:** Kevin D. Holden, JACKSON LEWIS PC, Richmond, Virginia, for Appellants. James B. Thorsen, MARCHANT, THORSEN, HONEY, BALDWIN & MEYER, LLP, Richmond, Virginia, for Appellee. Mary J. Rieser, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Curiae. **ON BRIEF:** M. Patricia Smith, Solicitor of Labor, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Jennifer S. Brand, Associate Solicitor, William C. Lesser, Deputy Associate Solicitor, Megan E. Guenther, Counsel for Whistleblower Programs, Office of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Curiae.

_____

THACKER, Circuit Judge:

The Sarbanes-Oxley Act of 2002 makes it illegal for publicly traded companies to retaliate against employees who report potentially unlawful conduct. See 18 U.S.C. § 1514A(a). In this case, a video game publishing company, SouthPeak Interactive Corp. ("SouthPeak"),[1] fired its chief financial officer after she raised concerns about a misstatement on one of the company's filings with the Securities and Exchange Commission ("SEC"). A jury found that the company and two of its top officers violated the Sarbanes-Oxley Act, and the district court awarded the chief financial officer more than half a million dollars in back pay and emotional distress damages.

The ensuing appeal raises a number of questions about employees' rights under the Sarbanes-Oxley Act. The case requires us to consider such issues as when a whistleblower may file suit, what she needs to do to exhaust her administrative remedies, and what types of remedies are available under the statute. We affirm the district court's rulings on each of these issues. In doing so, we hold that Sarbanes-Oxley Act

---

[1] In May 2008, a publicly traded acquisition company named Global Services Partners Acquisition Corp. ("GSPAC") acquired all of the outstanding membership interests of SouthPeak. GSPAC adopted SouthPeak's name as its own.

retaliatory discharge claims are subject to the four-year statute of limitations under 28 U.S.C. § 1658(a), and not the two-year limitations period set forth in § 1658(b)(1). We further hold that the administrative complaint in this case satisfies the exhaustion requirement, and that emotional distress damages are available under the statute.

The case also requires us to address the handling of apparent inconsistencies in a jury verdict and the steps a court must take in calculating attorneys' fees. On these issues, too, we affirm the district court.

## I.

SouthPeak is a Virginia-based company that designs, develops, and distributes video games for PlayStation, Xbox, Wii, and other gaming systems. In June 2007, the company hired Andrea Gail Jones ("Appellee") to work as an accountant. It later promoted Appellee to chief financial officer.

## A.

In February 2009, SouthPeak sought to place an order with Nintendo for 50,400 units of a video game called My Baby Girl. SouthPeak's chief executive officer, Melanie Mroz ("Mroz"), and its chairman, Terry Phillips ("Phillips"), hoped to place the order "as soon as possible," but the company lacked

the funds it would need to pay Nintendo in advance. J.A. 332.[2] To avoid delay, Phillips directed his assistant to send Nintendo a wire transfer of $307,400 from Phillips's personal account. However, the company did not properly record this debt on its balance sheet or in its quarterly financial report, which was filed with the SEC on May 15, 2009.

When informed of the omission, Appellee became "very concerned." J.A. 1178. She asked Phillips for an explanation. His response, she said, "did not seem, I guess, to make sense or seem credible to me." Id. at 1226. About a week later, Appellee called the chairman of SouthPeak's audit committee to report her suspicion that the company was engaging in a fraud.

On August 3, 2009, SouthPeak's outside counsel asked Appellee to review and approve draft language for an amendment to the company's erroneous quarterly report. The proposed amendment denied any intentional fraud or misstatement in the earlier filing. Appellee refused to sign the amended report. In an August 13, 2009 letter to the outside counsel, she explained, "I do not know how a conclusion of no intentional

---

[2] This case involves two sets of appeals, each with its own case number and joint appendix. Though we consolidated the two appeals (previously labeled 13-2399 and 14-1765) in September 2014, the joint appendices have not been merged. Here, we quote only from the joint appendix associated with Case No. 13-2399. All citations to the "J.A." refer to this joint appendix.

wrongdoing or fraud can be reached." J.A. 1274. That same day, SouthPeak's six-member board of directors held a special meeting in which it voted to terminate Appellee's employment. Mroz notified Appellee of the board's decision the next day.

B.

Appellee, through counsel, filed a complaint with the Occupational Safety and Health Administration ("OSHA") on October 5, 2009. The complaint states, "On August 14, 2009, in a clear violation of the [Securities Exchange] Act, SouthPeak terminated Jones' employment, apparently in retaliation for Ms. Jones [sic] attempts to correct statements in periodic reports filed, and proposed to be filed, by SouthPeak . . . ." J.A. 643. In the second numbered paragraph, the complaint further provides:

> The names and addresses of the company(s) and person(s) who are alleged to have violated the Act (who the complaint is being filed against):
>
> SouthPeak Interactive Corporation
> 2900 Polo Parkway.
> Midlothian, VA 23113
> 804-378-5100
>
> Terry Phillips, Chairman of the Board
> Patrice Strachan, [VP] of Operations
> Melanie Mroz, Chief Executive Officer

Id. at 645.

On October 16, 2009, OSHA sent SouthPeak a letter notifying the company of Appellee's complaint, along with a copy

6

of the complaint itself. The letter was addressed exclusively to SouthPeak, without any reference to Mroz or Phillips.

More than 180 days passed without a final order from OSHA; consequently, on July 23, 2010, Appellee sent OSHA a letter explaining that she was electing to file a federal lawsuit pursuant to the Sarbanes-Oxley Act and 29 C.F.R. § 1980.114(b). See 18 U.S.C. § 1514A(b)(1)(B) (authorizing suits at law or equity in federal court if the Secretary of Labor "has not issued a final decision within 180 days of the filing of [an OSHA] complaint"). Appellee sent a copy of the letter to a lawyer identified as "Counsel for SouthPeak Interactive Corp." She did not send a copy to Mroz or Phillips.

C.

Appellee waited nearly two years to file suit. Her June 18, 2012 complaint named SouthPeak, Mroz, and Phillips (collectively, "Appellants") as defendants. The claims included one count of retaliation pursuant to the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, and one count of retaliation pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), 15 U.S.C. § 78u-6(h)(1)(A).[3] The district court granted Appellants' motion to dismiss the Dodd-Frank claims on

---

[3] The complaint also included a breach-of-contract claim, but Appellee withdrew this claim prior to trial.

7

retroactivity grounds. The court, however, denied Appellants' motion to dismiss the Sarbanes-Oxley Act claims, rejecting Appellants' arguments that the statute of limitations barred those claims and that Appellee failed to exhaust her administrative remedies.

A jury trial began on July 15, 2013. At the conclusion of the trial, the jury was provided a verdict form naming each of the three defendants. The form addressed each defendant separately. If the jury found a defendant liable, it could place a check mark next to a statement to that effect. The form also provided blank spaces for any back pay or compensatory damages the jury wished to assess against that defendant.

The jury returned a verdict (the "First Verdict") finding each of the three defendants was liable. With regard to SouthPeak, the jury assessed $593,000 in back pay and $357,000 in compensatory damages. However, the jury did not assess any damages against Mroz or Phillips. In a sidebar conference with counsel, the court expressed some confusion over whether the jury might be "trying to account for no duplication of damages. And I think I need to ask them if that's what they're doing or if they think that there were no damages caused." J.A. 1935. Turning to the jury, the court advised:

Ladies and gentlemen, I notice that in one place you articulate a sum to be assessed as damages for compensatory and backpay. In two other places, you find the respective defendants liable but express no damage figure at all. It is unclear to us whether you are finding that that particular defendant caused no damage or you are simply trying to avoid awarding more than you awarded, more damage than you found that Ms. Jones had suffered. . . .

. . .

So I'm going to let you go back and take your verdict form, and if you mean it, with those instructions, you can return it, or you can amend it, or you can do such else, or send a question, or do whatever you need to do.

Id. at 1936-37.

Before the jury could return to the jury room, the court agreed to a second sidebar conference with counsel. During this discussion, Appellants' attorney told the court, "I just want to make sure the jury doesn't take it from your instruction that they can go back and change it to have damage against each of them. . . . I thought that maybe you were suggesting that that's what they were supposed to do." J.A. 1937. To address this concern, the court clarified its previous instruction, telling the jurors:

I am not by giving you this instruction trying to do anything but clear up what appears to be a problem. I am not telling you what you have to do, nor suggesting that you need to put a damage figure in either of those places where you have a zero, but we

9

> need to make sure we have a verdict that we know what you are doing.

Id. at 1938.

Following a brief discussion in the jury room, the jury passed the court a note stating: "From SouthPeak we want a total of 593,000 back pay [and] 357,000 compensatory. We do not find that Terry Phillips or Melanie Mroz are individually responsible for any amount." J.A. 2052 (alteration in original) (internal quotation marks omitted). Conferring again with counsel, the court said, "[I]t seems to me if that's what they want to do, they need to make another finding on their verdict form. . . . [T]hey need to check the one that says you're not liable." Id. at 1939. The attorneys for both sides said they agreed.

When the jury returned, the foreperson confirmed that Mroz and Phillips were not individually responsible. "Then what you need to do," the court said, "is eliminate the checkmarks [indicating liability for Mroz and Phillips] and initial it there, and then we will have the verdict." J.A. 1941. The court asked the foreperson, "Do you need to retire or can you do it here?" Id. The foreperson said she did not need to retire, "but evidently someone else does." Id. With that, the court permitted the jury to return once more to the jury room.

10

When, at last, the court session resumed, the jury returned another verdict (the "Final Verdict") in which it again found all three defendants liable. This time, the assessment against SouthPeak comprised $593,000 in back pay and no compensatory damages. The assessments against Mroz and Phillips were for $178,500 apiece in compensatory damages. In a sidebar conference, Appellants' attorney asked the court to "instruct that they go back and reconsider because it is impossible to come up with that verdict. . . . Clearly, there is something wrong with the way they understand this case because it doesn't stand to reason, and the evidence wouldn't support a verdict of that nature." J.A. 1947-48. The attorney then requested a mistrial. The court denied the request. When the sidebar conference ended, the clerk polled the jury; every member affirmed the Final Verdict.

D.

Appellants moved for a new trial, remittitur, or an amended judgment pursuant to Rules 59 and 60 of the Federal Rules of Civil Procedure. They argued, among other things, that the back pay award was not supported by the evidence, and that the compensatory damages assessed against Mroz and Phillips were excessive. Appellants also argued that the court should have accepted the First Verdict. On October 29, 2013, the district court denied most of Appellants' requests. The court, however,

11

reclassified the assessment against SouthPeak, holding the company responsible for $470,000 in back pay and $123,000 in compensatory damages. The court also granted SouthPeak's motion for a new trial nisi remittitur with regard to the compensatory damages awards against Mroz and Phillips, giving Appellee an opportunity to accept a reduced award of $50,000 apiece from those two defendants. Appellee accepted the reduced award.

On December 20, 2013, Appellee petitioned the court for an order holding Appellants jointly and severally liable for $406,851 in attorneys' fees. Ultimately, the court awarded $354,127.05 in attorneys' fees. As requested, the court held Appellants jointly and severally liable for the sum.

II.

A.

Statute of Limitations

We first consider Appellants' contention that the statute of limitations bars this action. This is a legal issue, which we review de novo. See Sewell Coal Co. v. Dir., Office of Workers' Comp. Programs, 523 F.3d 257, 259 (4th Cir. 2008).

Appellee filed suit on June 18, 2012, a little less than three years after her termination. The district court held that the Sarbanes-Oxley Act claims were timely because the suit commenced within the four-year time limit set forth in 28 U.S.C. § 1658(a). However, Appellants argue that § 1658(a) does not

12

apply to these claims.  Rather, they say, Appellee's action is subject to the two-year limitations period set forth in § 1658(b) because the retaliatory discharge claims "involve[] a claim of fraud . . . in contravention of a regulatory requirement concerning the securities laws."   28 U.S.C. § 1658(b).

Section 1658(a) supplies a "catchall," or "fallback," statute of limitations for certain federal statutes that "create[] a cause of action but [are] silent as to the applicable limitations period."   H.R. Rep. No. 101-734, at 24 (1990); see Jones v. R. R. Donnelley & Sons Co., 541 U.S. 369, 371 (2004).  The default provision states:

> Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.

28 U.S.C. § 1658(a).  This provision was on the books for more than a decade before Congress amended Section 1658 as part of the Sarbanes-Oxley Act.   With this legislation, Congress retained the default provision but added a new subsection, (b), which provides:

> Notwithstanding subsection (a), a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)),

13

may be brought not later than the earlier of--

    (1) 2 years after the discovery of the facts constituting the violation; or

    (2) 5 years after such violation.

Id. § 1658(b).

Courts have not hesitated to apply § 1658(b) to securities fraud claims brought under section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b). See In re Exxon Mobil Corp. Sec. Litig., 500 F.3d 189, 196 (3d Cir. 2007) ("Indeed, the implied cause of action recognized under § 10(b) is widely known and referred to as 'securities fraud.' To conclude that § 1658(b) does not apply to § 10(b) claims would be absurd." (citation omitted)). It is easy to see why this is so. Congress confined § 1658(b)'s reach to causes of action involving a claim of "fraud, deceit, manipulation, or contrivance in contravention of" securities regulations. 28 U.S.C. § 1658(b). This language, as several courts have previously noted, closely tracks the language of section 10(b) of the Securities Exchange Act, "which creates liability for 'any person' who 'employ[s] . . . any manipulative or deceptive device or contrivance in contravention of' SEC regulations." In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 197 (S.D.N.Y. 2003) (alterations in original) (quoting 15 U.S.C. § 78j(b)); see In re Exxon Mobil, 500 F.3d at 196.

14

Typically, a section 10(b) securities fraud action requires a plaintiff to "prove six elements: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" Yates v. Mun. Mortg. & Equity, LLC, 744 F.3d 874, 884 (4th Cir. 2014) (quoting Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008)). The second element, scienter, separates securities fraud from other causes of action under the Securities Exchange Act. It requires the plaintiff to prove not only that the defendant made a material misrepresentation, but that he did so with the "intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (internal quotation marks omitted).

The text of § 1658(b), with its references to "fraud," "deceit," "manipulation," and "contrivance," strongly implies a need for proof of fraudulent intent.[4] The Third Circuit has held

---

[4] Section 1658(b)(1) speaks in terms of "discovery." See 28 U.S.C. § 1658(b) (barring suits brought later than "2 years after the discovery of the facts constituting the violation"). In this context, the Supreme Court has said, the word "discovery" is a term of art. See Merck & Co. v. Reynolds, 130 S. Ct. 1784, 1793 (2010). It alludes to the "'discovery rule,' a doctrine that delays accrual of a cause of action until the (Continued)

accordingly, concluding that § 1658(b) applies only to section 10(b) securities fraud claims "and other claims requiring proof of fraudulent intent." In re Exxon Mobil, 500 F.3d at 197. In In re Exxon Mobil Corp. Securities Litigation, the Third Circuit determined that § 1658(b) did not apply to claims for false or misleading proxy statements pursuant to section 14(a) of the Securities Exchange Act because such claims do not require proof of fraudulent intent. Id.

Here, in their opening brief, Appellants argue that § 1658(b) covers Appellee's Sarbanes-Oxley Act claims because those claims involve "allegations of fraud." Appellants' Br. 13. However, § 1658(b) does not speak in terms of "allegations." Per its text, § 1658(b) covers private rights of action that "involve[] a claim of fraud." 28 U.S.C. § 1658(b) (emphasis supplied). Appellee has not advanced a claim of

---

plaintiff has 'discovered' it." Id. In fraud cases, it is a well-settled principle that the limitations period does not begin until the plaintiff discovers the facts constituting the fraud or, with due diligence, should have discovered such facts. See id. at 1794. Critically, though, the Supreme Court has held that discovery of an alleged misrepresentation is not alone sufficient to start the two-year limitations period for a securities fraud claim. In Merck & Co. v. Reynolds, the Court held that the § 1658(b)(1) limitations period could not commence without discovery of scienter, since "[a] plaintiff cannot recover [for securities fraud] without proving that a defendant made a material misstatement with an intent to deceive -- not merely innocently or negligently." Id. at 1796 (emphasis omitted).

16

fraud. Her claim, rather, alleges retaliatory discharge under the Sarbanes-Oxley Act. To succeed on this claim, she must show that (1) she engaged in protected activity, (2) the employer knew that she engaged in the protected activity, (3) she suffered an unfavorable personnel action, and (4) the protected activity was a contributing factor in the unfavorable action. See Feldman v. Law Enforcement Assocs. Corp., 752 F.3d 339, 344 (4th Cir. 2014). The first of these elements does not require proof that the employer's conduct was, in fact, a legally actionable fraud. The whistleblower need only show that she "had both a subjective belief and an objectively reasonable belief that the conduct" violated relevant law. Welch v. Chao, 536 F.3d 269, 275 (4th Cir. 2008) (internal quotation marks omitted). Though courts have stated that the whistleblower's theory of fraud should "at least approximate the basic elements" of fraud, Day v. Staples, Inc., 555 F.3d 42, 55 (1st Cir. 2009); accord Van Asdale v. Int'l Game Tech., 577 F.3d 989, 1001 (9th Cir. 2009), it is not necessary to show that a shareholder would, in fact, have accrued a cause of action.

Appellee's complaint was not specific in identifying the securities law that she believed Appellants violated. Her allegation does, however, approximate the basic elements of a section 10(b) securities fraud claim. While a shareholder bringing a section 10(b) claim would bear the burden of

17

establishing a strong inference of scienter, see 15 U.S.C. § 78u-4(b)(2)(A), Appellee is under no such obligation. Her retaliation claim can succeed without "discovery of the facts constituting" securities fraud. 28 U.S.C. § 1658(b)(1). It stands to reason, then, that § 1658(b)(1), which hinges on the discovery of such facts, does not apply. Section 1658(a) controls, and because Appellee brought her suit within that section's four-year window, her claim is not barred.

B.

Exhaustion of Administrative Remedies

The next question before us is whether Appellee properly exhausted her administrative remedies as to Mroz and Phillips. This is a pure question of law, which we review de novo. See E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ., No. 13-2330, 2014 WL 6783052 (4th Cir. Dec. 3, 2014).

By statute, a Sarbanes-Oxley Act whistleblower cannot go straight to court. Rather, she must first file an administrative complaint with the Secretary of Labor. See 18 U.S.C. § 1514A(b)(1). This complaint must be filed "not later than 90 days after the date on which such violation occurs." 49 U.S.C. § 42121(b)(1). The whistleblower must then wait 180 days for OSHA to investigate the allegation and issue a decision. See 18 U.S.C. § 1514A(b)(1)(B). If, after 180 days, OSHA has not issued a final decision "and there is no showing that such

18

delay is due to the bad faith of the claimant," the whistleblower may bring suit "for de novo review in the appropriate district court of the United States." Id.

Appellants recognize that Appellee's administrative complaint was timely, and that OSHA did not issue a final decision within 180 days. They argue, though, that the OSHA complaint did not clearly identify Mroz and Phillips as respondents. They further assert that even if the fault lies with OSHA for failing to pursue claims against Mroz and Phillips, the burden was on Appellee to press OSHA to address its oversight.

To be sure, an exhaustion requirement would be meaningless if the complainant were free to litigate claims bearing little or no connection to the preceding administrative complaint. In the context of Title VII cases, we have long recognized that "[t]he scope of the plaintiff's right to file a federal lawsuit is determined by" the contents of the charge filed with the Equal Employment Opportunity Commission ("EEOC"). Jones v. Calvert Grp., Ltd., 551 F.3d 297, 300 (4th Cir. 2009); see Chacko v. Patuxent Inst., 429 F.3d 505, 506 (4th Cir. 2005) (holding that a Title VII plaintiff "fails to exhaust his administrative remedies where . . . his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal

19

suit"). However, we have also said that the administrative charge "does not strictly limit" the ensuing lawsuit. Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002) (internal quotation marks omitted). Rather, the litigation may encompass claims "reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996); see Sydnor v. Fairfax Cnty., Va., 681 F.3d 591, 595 (4th Cir. 2012) ("The touchstone for exhaustion is whether plaintiff's administrative and judicial claims are reasonably related, not precisely the same . . . ." (citation and internal quotation marks omitted)).

Our decision in Sydnor v. Fairfax County, Virginia, 681 F.3d 591 (4th Cir. 2012), is illustrative. There, a disabled nurse indicated in a questionnaire accompanying her EEOC charge that she had sought authorization to perform light-duty work. Later, in a lawsuit alleging a violation of the Americans with Disabilities Act, she sought a different accommodation -- namely, authorization for full-duty work with the assistance of a wheelchair. See 681 F.3d at 594. We found this distinction to be insignificant, reasoning that the EEOC questionnaire afforded the nurse's employer "ample notice of the allegations against it." Id. at 595. We stated, "The exhaustion requirement should not become a tripwire for hapless

20

plaintiffs. While it is important to stop clever parties from circumventing statutory commands, we may not erect insurmountable barriers to litigation out of overly technical concerns." Id. at 594.

Nothing in the record before us suggests that Appellee was trying to circumvent the Sarbanes-Oxley Act exhaustion requirement. See Woodford v. Ngo, 548 U.S. 81, 90 (2006) ("[E]xhaustion requirements are designed to deal with parties who do not want to exhaust . . . ."). Appellee's OSHA complaint is substantially similar to her complaint in this action. The alleged harm, a retaliatory termination, is identical. In addition, the OSHA complaint plainly identifies Mroz and Phillips as "person(s) who are alleged to have violated the Act (who the complaint is being filed against)." J.A. 645. Nothing more precise is required. Indeed, the Department of Labor regulations in effect at the time Appellee filed the complaint expressly provided that "[n]o particular form of complaint is required." 29 C.F.R. § 1980.103(b) (2009). Appellee satisfied her burden, and OSHA's subsequent treatment of the complaint cannot take away her opportunity to seek recourse. Cf. B.K.B. v. Maui Police Dep't, 276 F.3d 1091, 1099 (9th Cir. 2002) ("The EEOC's failure to address a claim asserted by the plaintiff in her charge has no bearing on whether the plaintiff has exhausted her administrative remedies with regard to that claim.").

21

We recognize that a primary objective of exhaustion requirements is to put parties on notice of the allegations against them. In the context of Title VII actions, exhaustion gives the employer an opportunity to investigate and resolve the issue and "prevents the employer from later complaining of prejudice, since it has known of the allegations from the very beginning." Chacko, 429 F.3d at 510. Here, though, there can be no doubt that Mroz and Phillips were well aware of Appellee's allegations. Mroz was the company's chief executive, and Phillips its chairman. In its October 2009 letter notifying SouthPeak of Appellee's administrative complaint, OSHA listed Phillips as the contact person for the company. Subsequently, SouthPeak's counsel discussed the complaint with both Mroz and Phillips. Surely, it could not have gone unnoticed that the complaint identified Mroz and Phillips as "person(s) who are alleged to have violated the Act." J.A. 645. It should not have been all that surprising, then, when Appellee named the two executives in the instant civil action.

## C.

### Nature of Available Remedies

Appellants next challenge the award of emotional distress damages. The Final Verdict held Mroz and Phillips accountable for $178,500 apiece in compensatory damages. The district court, which later reduced that sum to $50,000 apiece,

22

inferred that these awards must represent Appellee's damages for emotional distress. Appellants argue that such damages are not permissible under the whistleblower protection provisions of the Sarbanes-Oxley Act. We reject this reading of 18 U.S.C. § 1514A(c), which expressly entitles a prevailing employee to "all relief necessary to make [her] whole." 18 U.S.C. § 1514A(c)(1). We also reject Appellants' backup argument that the emotional distress award in this case was excessive.

1.

Availability of Emotional Distress Damages

The first question is whether emotional distress damages are available under 18 U.S.C. § 1514A(c). This, too, is a question of law that we review de novo. See Rice v. Cmty. Health Ass'n, 203 F.3d 283, 287 (4th Cir. 2000) (applying de novo review to a district court's determination that West Virginia contract law permitted consequential damages).

The remedies provision at § 1514A(c) has two parts. Subsection (c)(1) provides: "An employee prevailing in any [enforcement] action under [18 U.S.C. § 1514A(b)(1)] shall be entitled to all relief necessary to make the employee whole." 18 U.S.C. § 1514A(c)(1). In subsection (c)(2), the provision goes on to state that compensatory damages

shall include --

23

> (A) reinstatement with the same seniority status that the employee would have had, but for the discrimination;
>
> (B) the amount of back pay, with interest; and
>
> (C) compensation for any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees.

Id. § 1514A(c)(2).

Appellants argue that the three forms of compensatory damages itemized in subsection (c)(2) are the only forms of relief available under the statute. There are two problems with this argument. First, it all but ignores the language in subsection (c)(1) that says a prevailing employee "shall be entitled to all relief necessary to make the employee whole." 18 U.S.C. § 1514A(c)(1). Second, Appellants' interpretation of the words "shall include" in subsection (c)(2) is at odds with our precedent. In Project Vote/Voting for America, Inc. v. Long, we said that "the term 'shall include' sets a floor, not a ceiling." 682 F.3d 331, 337 (4th Cir. 2012) (internal quotation marks omitted) (interpreting section 8(i)(2) of the National Voter Registration Act). "Courts have repeatedly indicated that 'shall include' is not equivalent to 'limited to.'" Id.

To date, two federal circuit courts have considered the availability of emotional distress damages under § 1514A. Both have concluded that such damages are available. See

24

<u>Halliburton, Inc. v. Admin. Review Bd.</u>, 771 F.3d 254, 266 (5th Cir. 2014); <u>Lockheed Martin Corp. v. Admin. Review Bd.</u>, 717 F.3d 1121, 1138 (10th Cir. 2013). To support its position, Appellants can only direct our attention to a smattering of district court decisions, most of them unpublished. These cases, by and large, liken § 1514A(c) to the remedies provision in Title VII prior to its 1991 amendments. <u>See, e.g.</u>, <u>Walton v. NOVA Info. Sys.</u>, 514 F. Supp. 2d 1031, 1035 (E.D. Tenn. 2007); <u>Murray v. TXU Corp.</u>, No. Civ.A.3:03-CV-0888-P, 2005 WL 1356444, at *3 (N.D. Tex. June 7, 2005). At that time, Title VII provided:

> [T]he court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . ., or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e-5(g) (1988). In <u>United States v. Burke</u>, the Supreme Court held that this provision did not support damages for "pain and suffering, emotional distress, harm to reputation, or other consequential damages." 504 U.S. 229, 239 (1992). The district court opinions cited by Appellants suggest that the Sarbanes-Oxley Act remedies provision at 18 U.S.C. § 1514A(c) operates the same way.

25

The Fifth Circuit's decision in Halliburton, Inc. v. Administrative Review Board, 771 F.3d 254 (5th Cir. 2014), explains why the district courts' reasoning misses the mark. By its terms, the Sarbanes-Oxley Act provision entitles a prevailing plaintiff to "all relief necessary to make the employee whole." 18 U.S.C. § 1514A(c)(1). Pre-amendment Title VII was not so generous. See Halliburton, 771 F.3d at 265. Beyond that, the Sarbanes-Oxley Act "plainly affords at least some damages, that is, legal relief, in addition to equitable remedies." Id.; see 18 U.S.C. § 1514A(b)(1)(B) (authorizing Sarbanes-Oxley Act whistleblowers to bring "an action at law or equity"). Pre-amendment Title VII "afforded only equitable relief." Halliburton, 771 F.3d at 265.

In the Fifth Circuit's view, and in ours, the remedies provision in 18 U.S.C. § 1514A more strongly resembles the remedies provision for retaliation claims under the False Claims Act, 31 U.S.C. § 3730(h). In language that parallels the provision now before us, the False Claims Act states that a prevailing plaintiff "shall be entitled to all relief necessary to make that [plaintiff] whole." 31 U.S.C. § 3730(h)(1). It further states that relief "shall include" reinstatement, back pay, and "compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." Id. § 3730(h)(2). Every federal

26

circuit court to have addressed the issue has concluded that the False Claims Act "affords noneconomic compensatory damages." Halliburton, 771 F.3d at 265; see Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd., 277 F.3d 936, 944 (7th Cir. 2002) (stating that the allowance for special damages in 31 U.S.C. § 3730(h) "permits recovery for emotional distress"); Hammond v. Northland Counseling Ctr., Inc., 218 F.3d 886, 892-93 (8th Cir. 2000).

Though the case before us centers on a termination of employment, we note that the Sarbanes-Oxley Act whistleblower protection provisions proscribe a wide range of retaliatory actions, including threats and harassment. See 18 U.S.C. § 1514A(a). There will be times when the primary harm will be noneconomic. In these instances, the Department of Labor (the "Department") observes, "non-pecuniary compensatory relief, such as emotional distress damages, may be the only remedy that would make the complainant whole." Amicus Br. 23. The Department takes the position that the statute countenances emotional distress awards, and indeed the Department's Administrative Review Board has a history of upholding non-pecuniary compensatory damages in Sarbanes-Oxley Act whistleblower cases. See Menendez v. Halliburton, Inc., Case Nos. 09-002, -003, 2013 WL 1282255, at *11 (Admin. Rev. Bd. March 15, 2013). In these circumstances, where Congress has explicitly empowered the Department to enforce § 1514A by formal adjudication, we afford

27

deference to the Department's interpretation.  See Welch, 536 F.3d at 276 n.2.  We therefore join the Department, and the Fifth and Tenth Circuits, in concluding that emotional distress damages are available under § 1514A(c).

2.

## Amount of Emotional Distress Damages

Appellants argue in the alternative that the emotional distress award was excessive.  Appellants, we note, have already benefitted from a reduction in the emotional distress damages.  In its Final Verdict, the jury found Mroz and Phillips liable for $178,500 apiece, all for emotional distress.  The district court later reduced these awards to $50,000 apiece.

The "power and duty of the trial judge to set aside" an excessive verdict is "well-established."  Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 304 (4th Cir. 1998) (internal quotation marks omitted).  Under Rule 59(a) of the Federal Rules of Civil Procedure, a court may order a new trial nisi remittitur if it "concludes that a jury award of compensatory damages is excessive."  Sloane v. Equifax Info. Servs., LLC, 510 F.3d 495, 502 (4th Cir. 2007).  On appeal, we reverse the grant or denial of a motion for new trial "only upon a showing of abuse of discretion.  Pursuant to this standard, '[w]e must give the benefit of every doubt to the judgment of the trial judge,' while recognizing that 'there must be an upper limit [to

28

allowable damages].'" Cline, 144 F.3d at 305 (alterations in original) (citation omitted) (quoting Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 435 (1996)).

We find no abuse of discretion here. To the contrary, the district court's opinion offers a meticulous and well-reasoned explanation for the reduced award the court selected. See Jones v. SouthPeak Interactive Corp. of Del., 982 F. Supp. 2d 664, 677–82 (E.D. Va. 2013). The court properly took note of Appellee's testimony about the toll her firing took on her family and her psyche. Appellee, describing herself as the "bread winner of the family," testified that her termination "caused concern . . . . We have four children [who at] that time ranged from age eleven to age four. So there was a lot of responsibility, and always has been on my shoulders to provide for the family." J.A. 1278. Appellee said she felt "awful" because she had no choice but to seek unemployment benefits. Id. at 1279. On job interviews, she said, the interviewer "would always get to the question, why you were terminated[.] And that was not a good conversation." Id. at 1287. All told, it took 23 months for Appellee to secure a new full-time job.

Appellee also testified that, even years after her termination, she still cries sometimes when she thinks about her experience at SouthPeak. As the district court noted, Appellee's husband corroborated her account, saying he has "been

29

woken up many times in the middle of the night with her crying. Not understanding, like, people do the things they do, and lie about her. And just not knowing why bad things happen." Jones, 982 F. Supp. 2d at 680.

After concluding that the evidence supported an award for emotional distress, the court compared the jury's damages assessment to awards in comparable cases, just as we have done in our own review of awards for emotional distress. See, e.g., Hetzel v. Cnty. of Prince William, 89 F.3d 169, 172-73 (4th Cir. 1996) (comparing cases involving awards for emotional distress). This was a sound approach. We see no reason to disturb the court's judgment.

D.

## Perceived Inconsistencies in the Verdict

We turn now to the hubbub that followed the jurors' emergence from the jury room. Appellants raise two arguments about this stage of the proceedings. In the first place, they argue that the court should have accepted the First Verdict. Separately, Appellants argue that the court should not have accepted the Final Verdict. We address each of these arguments in turn.

1.

<u>The First Verdict</u>

First, we consider the district court's decision to reject the First Verdict as inconsistent. As this presents a mixed question of law and fact, <u>see</u> <u>Wilks v. Reyes</u>, 5 F.3d 412, 415 (9th Cir. 1993), we inspect the court's factual findings for clear error and examine de novo the legal conclusions derived from those facts, <u>see</u> <u>Meson v. GATX Tech. Servs. Corp.</u>, 507 F.3d 803, 806 (4th Cir. 2007). Actions taken after the inconsistency determination are reviewed for abuse of discretion. <u>See</u> <u>Hauser v. Kubalak</u>, 929 F.2d 1305, 1308 (8th Cir. 1991) (per curiam).

Rule 49(b)(3) of the Federal Rules of Civil Procedure outlines several options available to a district court when answers to written questions are inconsistent with a general verdict.[5] These options are: "(A) approve, for entry under Rule

_____

[5] Rule 49(b) covers general verdicts, which are those "by which the jury finds in favor of one party or the other, as opposed to resolving specific fact questions." <u>Black's Law Dictionary</u> 1696 (9th ed. 2009). The rule does not apply to special verdicts -- i.e., verdicts "in which the jury makes findings only on factual issues submitted to them by the judge, who then decides the legal effect of the verdict." <u>Id.</u> at 1697. Although the verdict form here has characteristics of both a general verdict and a special verdict, in that it seeks a conclusion on liability but separate damage assessments for each defendant, it is best characterized as a general verdict. <u>See</u> <u>Mason v. Ford Motor Co.</u>, 307 F.3d 1271, 1275 (11th Cir. 2002) (per curiam) (characterizing a similar verdict form as a general verdict).

31

58, an appropriate judgment according to the answers, notwithstanding the general verdict; (B) direct the jury to further consider its answers and verdict; or (C) order a new trial." Fed. R. Civ. P. 49(b)(3). The purpose of this rule, we have stated, "is to promote the efficiency of trials by allowing the original deliberating body to reconcile inconsistencies without the need for another presentation of the evidence to a new body." Austin v. Paramount Parks, Inc., 195 F.3d 715, 725 (4th Cir. 1999) (internal quotation marks omitted).

A district judge who "concludes that an inconsistent verdict reflects jury confusion or uncertainty . . . has the duty to clarify the law governing the case and resubmit the verdict for a jury decision." Hafner v. Brown, 983 F.2d 570, 575 (4th Cir. 1992). In Hafner v. Brown, the jury's initial responses on the verdict form indicated that two Baltimore police officers were liable for conspiracy in a civil suit pursuant to 42 U.S.C. § 1983. 983 F.2d at 574. The jury awarded punitive damages against those officers, but, perplexingly, it awarded no compensatory damages. See id. We agreed that the jurors "clearly were confused," and held, accordingly, that the district court did not err in offering a supplemental jury instruction and allowing the jury to reconvene for further deliberation. Id. at 574-75.

Here, the jury found all three Appellants liable. Although it would not necessarily be inconsistent to find liability but assess no damages, see Zhang v. Am. Gem Seafoods, Inc., 339 F.3d 1020, 1036 (9th Cir. 2003), it is difficult to square what the jury did in the First Verdict. With this verdict, the jury indicated that Appellee was entitled to back pay and compensatory damages, but only from SouthPeak. This is peculiar, given Mroz and Phillips's involvement in the unlawful termination. Faced with this discrepancy, the district court did the sensible thing: it conferred with counsel, then administered a supplemental jury instruction and sent the jury back to redeliberate. See Hafner, 983 F.2d at 575. In the process, the court identified the source of its confusion but was careful to state that it did not wish to influence the jury's decision. We see no error.

### 2.

### The Final Verdict

We next consider the Final Verdict. Appellants argue that it was "irreconcilably inconsistent to find that SouthPeak . . . caused back pay damages but no compensatory damages and that Phillips and/or Mroz caused no back pay damages but did cause compensatory damages -- since it is the same set of facts alleged against each defendant that supposedly caused the same harm." Appellants' Br. 38. The district court

33

rejected this argument when Appellants raised it in a Rule 59 motion for a new trial. We review the denial of Appellants' motion for abuse of discretion. See Gregg v. Ham, 678 F.3d 333, 342 (4th Cir. 2012).

"A jury verdict may be set aside and the case remanded for a new trial when it is not possible to reconcile the findings. Likewise, a new trial is appropriate if the verdict is against the clear weight of the evidence . . . ." TransDulles Center, Inc. v. USX Corp., 976 F.2d 219, 227 (4th Cir. 1992). Here, the Final Verdict did not conflict with the jury instructions. See id. at 227-28 (rejecting a claim of verdict inconsistency where the verdict accorded with jury instructions). In charging the jury, the district court did not state that the jury must hold the defendants liable for equal sums. The court instructed the jury: "[I]f you return a verdict in favor of Mrs. Jones against any defendant, you should put in the amount of damages you think are recoverable." J.A. 1930. The jury did just that.

Appellants have not shown that the Final Verdict was "against the weight of the evidence or based on evidence which is false." Gregg, 678 F.3d at 343 (internal quotation marks omitted). While it is true that a single act -- a retaliatory discharge -- caused Appellee's injury, we believe a reasonable jury could recognize the distinct role that each appellant

34

played in that act. After all, it was SouthPeak -- not Mroz or Phillips -- that paid Appellee's salary and that stopped paying it upon her termination. Though Mroz and Phillips were involved in the decision to fire Appellee, they could not make it alone; that decision belonged to the entire board of directors. That being the case, it would hardly have been unreasonable for the jury to conclude that SouthPeak, rather than two of its executives, should cover the back pay award. Similarly, it is not unreasonable to conclude that Mroz and Phillips bear responsibility for Appellee's emotional distress. Both were involved in the decision to terminate Appellee. Beyond that, Phillips allegedly lied to Appellee about the errors in the company's SEC filings. And it was Mroz who delivered the news of Appellee's termination. Appellee testified that she has tearfully recalled her experiences at SouthPeak, again and again, in the years since her firing, and we do not doubt that these scenes loom in her recollections.

In short, we do not share Appellants' view that the Final Verdict was "inherently inconsistent." Appellants' Br. 38. The district court was not obliged to reject it, and its denial of Appellants' Rule 59 motion was not an abuse of discretion.

E.

Attorneys' Fees

Lastly, there is the matter of attorneys' fees. Appellants make two arguments. First, they assert that the district court failed to follow the three-step process outlined in McAfee v. Boczar, 738 F.3d 81 (4th Cir. 2013). Second, they challenge the court's joint-and-several allocation of attorneys' fees.

We review an award of attorneys' fees for abuse of discretion. See Robinson v. Equifax Info. Servs., LLC, 560 F.3d 235, 243 (4th Cir. 2009). In making this assessment, we recognize that our review of the record, no matter how careful, cannot substitute for the district court's "close and intimate knowledge of the efforts expended and the value of the services rendered." Id. (internal quotation marks omitted). Accordingly, "we will only reverse such an award if the district court is clearly wrong or has committed an error of law." McAfee, 738 F.3d at 88.

1.

Calculation of Attorneys' Fees

Our opinion in McAfee states that the "proper calculation of an attorney's fee involves a three-step process." 738 F.3d at 88. First, "the court must determine the lodestar figure by multiplying the number of reasonable hours expended

36

times a reasonable rate." Id. (internal quotation marks omitted). Second, "the court must subtract fees for hours spent on unsuccessful claims unrelated to successful ones. [Third], the court should award some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." Id. (citation omitted) (internal quotation marks omitted). Appellants argue the court neglected to perform the third step. They deem this omission a reversible error and urge us to vacate the fee award.

To be sure, it can be challenging to put a number on "success." There is no "precise rule or formula" to aid the court in determining just how successful a plaintiff may have been. Hensley v. Eckerhart, 461 U.S. 424, 436 (1983). To wit, the Supreme Court has said it would be inappropriate to simply compare "the total number of issues in the case with those actually prevailed upon." Id. at 435 n.11 (internal quotation marks omitted). Likewise, although we have advised courts to compare the damages award to the amount sought, a court should not reduce a fee award "simply because the plaintiff failed to prevail on every contention raised in the lawsuit." Id. at 435. A court may consider whether a fee award seems reasonable in light of the amount of damages awarded. However, "a substantial disproportionality between a fee award and a verdict, standing

37

alone, may not justify a reduction in attorney's fees." McAfee, 738 F.3d at 94.

Here, the district court did not organize its opinion as our instructions in McAfee indicate it should have. However, it is simply untrue to claim that the court failed to consider Appellee's degree of success. The court's opinion takes note of Appellants' claim that Appellee "was not successful in certain aspects of the case." Jones v. SouthPeak Interactive Corp. of Del., No. 3:12cv443, 2014 WL 2993443, at *11 (E.D. Va. July 2, 2014). The court acknowledged that Appellants, "to some extent, were successful in reducing the damage award." Id. at *12. However, it said, that reduction "is not an unsuccessful claim as to which a fee request needs to be reduced in the same manner as not succeeding on the claim at all." Id. The same is true, the court said, of Appellee's unsuccessful efforts to block discovery and to prevent the withdrawal of defense counsel. See id.

The court also addressed Appellants' argument that "the amount of hours attributed to post-judgment motions is excessive and in light of the limited success [Appellee] obtained at the post-judgment stage, it is not reasonable and it should be reduced." 2014 WL 2993443, at *14 (internal quotation marks omitted). In response, the court repeated that Appellee "had substantial and material success at trial . . . . [I]t is

38

not true that [Appellee] had limited success [in the post-judgment stage].  [Appellee] retained a large portion of the total judgment and she successfully opposed [Appellants'] request for a new trial."  Id.

Plainly, then, the court considered Appellee's success in the litigation and concluded that Appellee was substantially and materially successful.  The facts support this conclusion.  The jury found all three defendants liable for violations of the Sarbanes-Oxley Act and awarded damages against each defendant.  Following remittitur, the total award came out to $737,000, including $44,000 in pre-judgment interest.  This is about one-third of the roughly $2 million that Appellee sought.[6]  Given this result, we cannot say that declining to reduce the lodestar figure was an abuse of discretion.  See Hensley, 461 U.S. at 435 ("Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.").

2.

Allocation of Attorneys' Fees

Appellants' final argument is that the joint-and-several allocation of attorneys' fees was an abuse of

---

[6] Appellee's Rule 26 disclosures list $2,524,337 in damages sought.  This figure includes $500,000 in punitive damages; however, Appellee did not request punitive damages in her complaint.

discretion.  We disagree, on the ground that the district court enjoys considerable latitude in deciding how it will allocate attorneys' fees.

The proposition that district courts have discretion over the proper allocation of a fee award among multiple defendants is widely recognized.  See, e.g., Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 337 (1st Cir. 2008); Herbst v. Ryan, 90 F.3d 1300, 1304 (7th Cir. 1996); Council for Periodical Distribs. Ass'ns v. Evans, 827 F.2d 1483, 1487-88 (11th Cir. 1987).  Options available to a court may include: dividing the award equally among the defendants; apportioning the award according to the defendants' relative culpability; awarding fees "in the same proportions as [the] jury assessed actual damages"; or holding a single defendant liable for fees related to a claim for which that defendant was "solely or largely responsible." Council for Periodical Distribs., 827 F.2d at 1487-88.  A court is free to combine two or more of these methods, or it may select another method entirely.  See id. at 1488.

Two of our sister circuits -- the Seventh and District of Columbia Circuits -- have identified several situations in which it may be appropriate to hold all defendants jointly and severally liable for attorneys' fees.  See Turner v. D.C. Bd. of Elections & Ethics, 354 F.3d 890, 897-98 (D.C. Cir. 2004); Herbst, 90 F.3d at 1305.  For instance, they have said, "[i]t is

frequently appropriate to hold all defendants jointly and severally liable for attorneys' fees in cases in which two or more defendants actively participated in a constitutional violation." Herbst, 90 F.3d at 1305; accord Turner, 354 F.3d at 897. A defendant's ability to pay the award may be of some relevance as well. In civil rights cases, "courts have upheld the imposition of joint and several liability for a fee award where there existed a question as to whether the fee would be collectible from one of the defendants." Herbst, 90 F.3d at 1306 n.13; accord Turner, 354 F.3d at 897-98. The District of Columbia Circuit has also said that "a plaintiff's fully compensatory fee for claims centered on a set of common issues against two or more jointly responsible defendants should be assessed jointly and severally." Turner, 354 F.3d at 898 (internal quotation marks omitted).

Here, Appellants call on us to redistribute the fee award in proportion to each appellant's share of the damages awarded. We have never required a defendant's share of a fee award to equal his share of damages, nor have other circuits. See, e.g., Corder v. Gates, 947 F.2d 374, 383 (9th Cir. 1991) ("We have never mandated apportionment based on each defendant's relative liability under a jury's verdict."). Such a requirement would take away the discretionary power that district courts have traditionally enjoyed in this area.

41

Even if, in the first instance, we might not have decided to hold Appellants jointly and severally liable for the fee award, we cannot say that the district court's decision was an abuse of discretion. Mroz and Phillips were high-level executives at SouthPeak. Both were involved in the decision to fire Appellee. The claims against all three Appellants were the same, and although the damages awards ended up differing, the work that Appellee's counsel put into developing, investigating, and pursuing those claims cannot be so easily divided. Accordingly, we affirm.

III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

42